IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ALEX YOUSIF,                               )
                                           )
         Plaintiff,                 )
                                           )
        v.                         )        1:23-cv-81 (LMB/JFA)
                                           )
OFFICER PATRICK CARTER HAILEY, et al.,     )
                                           )
        Defendants.                )

MEMORANDUM OPINION

Before the Court is defendants Officer Patrick Carter Hailey ("Hailey") and Lieutenant

Dean Mathews' ("Mathews") (collectively, "defendants") Motion to Dismiss, or in the

Alternative, Motion for Summary Judgment ("Motion") [Dkt. No. 15] in this civil action brought

by pro se plaintiff Alex Yousif ("Yousif" or "plaintiff") under 42 U.S.C. § 1983 and Virginia

common law.  The Amended Complaint alleges that defendants conducted a constitutionally

unreasonable search and seizure, used excessive force, and engaged in common law false arrest,

battery, and assault when they detained Yousif for approximately one hour and twenty minutes

under suspicion that he was driving under the influence and posing a national security risk.  [Dkt.

No. 24]; BWC[1] Ex. A. 4:30-5:00.  Defendants contest these claims and have submitted video

evidence to support their argument that their actions were objectively reasonable under the

---

[1] All citations to "BWC" refer to defendants' body worn camera footage submitted on a USB
Drive.  See [Dkt. No. 21].  Ex. A refers to the body worn camera footage of defendant Hailey,
and Ex. B refers to the body worn camera footage of defendant Mathews.  Although both
cameras show the parties' interaction on the night of January 17, 2021 and both display the time
of night throughout the interaction, because Hailey turned his camera on at a different time than
Mathews, citations to a specific moment during the interaction differ based upon which camera
is being referenced.

circumstances. See [Dkt. No. 16]; BWC. Plaintiff has filed an opposition to the Motion [Dkt.

No. 33], defendants have filed a reply [Dkt. No. 36], and plaintiff has filed a sur-reply [Dkt. No.

39]. Defendants' Motion is therefore ripe for consideration, and for the reasons that follow, it

will be granted.[2]

## I. BACKGROUND

### A. Evidence Considered in Compilation of Factual Background

In support of their memoranda, the parties have submitted various exhibits, including

declarations, a field investigation report, medical reports, and receipts. [Dkt. Nos. 16-1, 16-2,

16-3, 33-1, 33-2, 33-3, 33-4, 33-5, 33-6, 33-7, 33-8]. Because both parties have objected to the

Court considering most of those exhibits and because the parties have not yet engaged in

discovery, defendants' Motion will be treated as a Motion to Dismiss. See Fed. R. Civ. P.

12(b)(6) (explaining that a complaint must be dismissed when it does not "contain sufficient

factual matter, accepted as true, to 'state a plausible claim for relief that is plausible on its

face'"); Laughlin v. Metro Washington Airports Auth., 149 F.3d 253, 260-61 (4th Cir. 1998)

(explaining that "[w]hen matters outside the pleading are presented to and not excluded by the

court," a Rule 12(b)(6) motion can "be treated as one for summary judgment").

In considering a motion to dismiss, courts may consider documents incorporated into the

complaint "so long as [the documents] are integral to the complaint and authentic." Philips v.

Pitt Cnty. Memorial Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Thus, in addition to considering

the Amended Complaint, the Court will refer to audio and video from defendants' body worn

cameras. Although defendants submitted that footage to support their Motion to Dismiss,

---

[2] Oral argument has been waived, and the Court finds that it would not aid in the decisional
process. See [Dkt. No. 20].

plaintiff also refers to it.[3]  That footage depicts the one-hour-and-twenty-minute incident at the

core of the Amended Complaint.[4]

### B. Factual Background

On January 17, 2021, at approximately 11:00 p.m., Yousif, who planned to spend the

evening at his friend's house following a drive from California, double-parked his car, which had

a California license plate, in a private, dimly-lit parking lot in Arlington, Virginia.  [Dkt. No. 24]

¶¶ 10-12.  As he waited for his friend to call him, Yousif "rested his head in his vehicle."  Id. at

¶ 13.  While patrolling the area, Mathews saw Yousif improperly parked and seemingly "passed

out" in the driver's seat of his car while its engine was running.  Mathews "went and got" Hailey

who, upon arriving in his own patrol car, also saw Yousif with his head down.  BWC Ex. A.

37:30.

The body camera footage, which had time indicators, showed that at 11:09 p.m.

defendants approach the passenger-side of Yousif's car and, because it was dark outside, Hailey

turn his flashlight on.  Id. at 1:00; [Dkt. No. 24] ¶ 10.  Hailey knocked on the passenger-side

window, and Yousif, appearing groggy and disoriented, rolled his window down.  BWC Ex. A.

1:00.  Concerned about Yousif's demeanor—especially given that the presidential inauguration

---

[3] In his Opposition, plaintiff complains that portions of the body worn camera footage are
"skippy," and as such, do not adequately depict the entirety of the parties' interaction.  See [Dkt.
No. 33] at 25 n.23.  The Court has reviewed the body worn camera footage from defendants and
finds that although the footage periodically freezes for 1-3 seconds at a time, both recordings
nevertheless depict the entirety of the relevant portions of the interaction.  The 1-3 second pauses
in the footage are minimal and seem to be a product of technological flaw, as evinced by the
continued conversation after the pauses, and are not the result of "authenticity" issues, as
plaintiff suggests.  See id. at 25-26 & n.23.

[4] Although the Amended Complaint references plaintiff's medical history allegedly resulting
from defendants' actions on January 17, 2021, the Court will not consider exhibits attached to
plaintiff's Opposition that purportedly detail his medical condition because, as defendants
correctly indicate, they are not "authentic."  See Philips, 572 F.3d at 180.

3

was just a few days away, Yousif's car had an out-of-state license plate, and he appeared "passed out"—Hailey asked him, "Hey bud what's going on?" BWC Ex. A. 1:10; 4:25; 6:25; 7:29. Yousif stated that his "head just really hurts really bad" and also quickly added "it's [sic] not drunk" to which Hailey responded "I didn't say anything about being drunk." Id. at 1:13. Hailey asked, "Do you want me to call medics" to "check you out and they can make sure you're good and all that?" Id. at 1:35. Yousif shook his head and quickly declined the offer. Id.

At 11:10 p.m., Hailey asked Yousif, "Where are you coming from tonight?" Yousif paused for a moment, looked down, and responded, "So I just came down from. I mean I drove all the way down from California. This was before. Now I am coming down from Maryland." Hailey then asked, "What are you in town for coming from California?" With some pausing, Yousif responded, "Um it's uh. Yeah, I'm coming for work." Id. at 2:00. Hailey asked Yousif where he worked and Yousif stated that he "work[s] for the government." Id. at 2:10. Hailey asked, "What do you do?" to which Yousif said, "Um sorry," nervously laughed, and added, "I mean I can show you my military ID." Id. Hailey then clarified, "Oh so you're in the military?" Yousif, looking disoriented, responded, "Yeah. I can show you my government ID." Id. at 2:20. In response, Hailey asked to see his identification. Yousif began to fish for his wallet in his pocket, but instead of providing an identification, Yousif stopped, unable to keep his eyes open, and stumbled as he said, "But uh sorry I just wanted to uh I just stopped here I didn't want to bother you guys." Id. at 2:30.

Hailey again asked for Yousif's identification. Yousif pulled out his Common Access Card ("CAC") and held it up to the window, covering a portion of it with his finger. Id. at 3:00. Hailey told Yousif to hand him the CAC, but Yousif refused to let go of his CAC and accidentally dropped the CAC in his car. While Yousif fumbled to pick it up he said, "Sir, I

4

showed you my ID" and "I thought it was illegal to like force people to like look at IDs." Id. at

3:10.  As Yousif continued asserting that Hailey's conduct was "illegal," Mathews walked to the

driver-side of Yousif's car.  Frustrated by Yousif's refusal to follow Hailey's command,

Mathews loudly ordered Yousif to "give [Hailey] your identification." Id. at 3:40.  After a few

seconds, Yousif handed over his CAC. Id. at 3:50.

 At 11:12 p.m., Hailey stepped away from the passenger-side window and walked toward

the back of Yousif's car.  On the body camera recording Hailey can be heard speaking to

someone to verify Yousif's identity and check the license plate of a "suspicious vehicle." Id. at

4:15.  Mathews stayed by Yousif's driver-side window, which was only rolled down about an

inch. Id. at 4:00; BWC Ex. B. 4:00.  When Mathews told Yousif to unlock his door, Yousif

began to protest, but Mathews interrupted him by ordering him again to unlock his door.  After

the second command, Yousif unlocked the door.  BWC Ex. B. 4:00.  Mathews told Yousif to

stay in the car and put his hands on the steering wheel, but Yousif ignored Mathews, instead

saying, "Sir I showed you my ID."  Mathews repeated the order a second time, and Yousif

finally complied. Id. at 4:25.

 Hailey briefly walked over to Yousif and Mathews.  Because the CAC listed the

Department of Defense as Yousif's employer but did not include his date of birth, he asked

Yousif for his date of birth. Id. at 4:30.  After Yousif provided a date, Mathews asked him why

he was in Virginia, and Yousif responded, "Sir, I am in the federal government." Id. at 4:40.

Mathews clarified, "What do you do?"  Yousif chuckled and evasively said, "Sir, I can't. I can't.

Sir, please." Id. at 4:45.  As Yousif said this, he moved his hands off the steering wheel, which

caused Mathews again to order him to "keep your hands where I can see them." Id. at 4:50.

Yousif put his hands back on the wheel and repeated that "I'm in the federal government" to

which Mathews said, "Ok and I am telling you to keep your hands on the steering wheel. If you take your hands off the steering wheel, I am going to take it as if you're going for a weapon. So put your hands on the steering wheel and don't move." Id. at 4:55. Once Yousif put his hands on the steering wheel, he restated that "I am in the federal government" for the third time. Id. at 5:00. Mathews calmly emphasized that "all I am trying to do is check on you and make sure you're ok but you're making things very difficult." Id. at 5:20.

At 11:14 p.m., Hailey, still unable to confirm Yousif's identity, returned to the passenger-side window of the car and explained to Yousif that "I need to know why you are here in Arlington County." BWC Ex. A. at 5:51. Yousif ignored the question and referred Hailey to his "CAC Card." Hailey repeated, "I need to know why you are here in Arlington County," to which Yousif responded that he was there to "sleep in my friend's room." Id. at 6:00. Because Yousif had already told Hailey that he came to Arlington for work, and not to visit a friend, Hailey, seemingly confused about Yousif's contradiction, clarified, "Why are you working here? You're not giving me a good reason on to why you're here." Id. Yousif, stumbling over his words, explained that he worked in Maryland but was in Virginia to visit a friend. Id. at 6:23. Hailey then asked, "Do you understand why I am a little suspicious of everything?" Yousif responded, "Right, I can understand that" and that "this happened to me a few days ago as well." Id. at 6:51.

At 11:15 p.m., after Hailey verbalized his heightened suspicion because Yousif had an out-of-state license plate and the presidential inauguration was in just a few days, Hailey asked Yousif for the name of the agency where he worked. Id. at 6:40. Yousif apprehensively

6

responded, "C'mon man, I can't tell you that" and "No. No. I don't need to tell you."[5] Id. at

7:00. Frustrated with Yousif's noncompliance, Hailey explained that "I am trying to figure out

what's going on here," to which Yousif retorted, "What's going on?" Id. at 7:20. Mathews, who

was standing by the driver-side door of Yousif's car during this conversation, clarified his

suspicion to Yousif, stating that "you are passed out in a vehicle, and I think you're drunk." Id.

at 7:25. Yousif began to protest, saying, "I'm not passed out" and "if you understood you know

what went on kind of these past few days." Id. at 7:30. While Yousif said this, he again moved

his hands off the steering wheel. In response, Mathews ordered Yousif to step out of his car.

BWC Ex. B. 7:35; [Dkt. No. 24] ¶ 20.

At 11:16 p.m., Hailey joined Mathews by the driver-side door while Yousif got out of the

car. Defendants ordered Yousif to put his hands on the car, but he ignored six commands by

defendants to put his hands on the car and instead repeatedly, and without being prompted, stated

that he worked for the National Security Agency, that defendants did not understand what he was

going through, that he had a top-secret clearance, and that he had a government badge. Ex. B.

7:42. In making these statements Yousif spoke over defendants and ignored their questions.

Mathews had to repeat questions many times, including asking if Yousif had "anything illegal,"

to which Yousif eventually replied that he did not. When Mathews asked Yousif whether

Mathews could search him, Yousif defiantly responded, "No. No. No. No." Id. at 8:15. As

Yousif again asked to get his government badge from his car, Mathews told Yousif that he could

not get his badge because he was "worried about the way things are going" and that Yousif was

---

[5] Neither camera is facing Yousif at this point in the interaction.

"being argumentative," to which Yousif combatively yelled, "I'm not!" and "I'm not being argumentative!"  Id. at 8:30.

At 11:17 p.m., Hailey escorted Yousif behind his car where there was more light, and despite already having been told that he could not get his badge, Yousif nevertheless repeated "can I please get my badge" five times in the span of twelve seconds.  BWC Ex. A 8:30. Because Yousif ignored defendants as he continuously asked to get his badge, defendants had to ask him to turn around to face Hailey five times before he finally complied.  Id. at 8:50.

A few moments later, Mathews asked Hailey to perform "the sobriety tests." Id. at 9:00. Yousif immediately backed away from Hailey, waved his arm, and excitedly said, "No. I don't have to take the tests legally." Id. at 9:10. Hailey, appearing surprised by Yousif's physical reaction, said, "I'm not giving you the test if you're refusing." Because Yousif had backed away from where Hailey told him to stand, Hailey again instructed Yousif that "I am telling you to stand right here. How hard is that? Stand right there." Id. at 9:15. Mathews then asked Yousif whether he could get Yousif's badge out of his car, but Yousif did not respond and instead repeated that he was not drunk but that he had had a long day. BWC Ex. B. 9:25.

At 11:19 p.m., after Mathews observed a bulge in Yousif's pocket, Hailey ordered Yousif to put his hands on the trunk of the car, and he patted Yousif down. BWC Ex. A. 10:30. When Yousif attempted to move his hands off the trunk of the car, Hailey again commanded him to keep his hands on the trunk and warned Yousif that if he moved his hands again, Hailey would place him "in handcuffs." Id. 11:05-11:25. Moments later, Yousif lifted his hands in a seemingly condescending manner, turned to Hailey, and said "Look." Id. 11:45-12:10. In response, Hailey handcuffed Yousif. This occurred ten minutes into the detention, without a

8

struggle.  At no point during the hour in which he was handcuffed did Yousif tell either defendant that the handcuffs were too tight.

　　As Hailey handcuffed Yousif, Mathews asked Yousif four times for his supervisor's name or contact information, but he refused to answer, instead exclaiming, "Guys," "I didn't do anything," and "I'm not passed out drunk."  BWC Ex. B. 11:58.  Because Yousif did not provide any information to corroborate the authenticity of his CAC, Mathews returned to his patrol car and tried to contact representatives at the Department of Defense, but a division representative did not initially answer the phone.  He also spent time trying to find the friend with whom Yousif said he was staying.  Id. at 12:30-32:52.

　　Meanwhile, Hailey stayed with Yousif.  As they waited, Yousif spontaneously began to laugh and asked, "Why am I being detained," to which Hailey responded that Yousif could not keep his hands on top of the car, which caused Hailey concern about his own safety.  BWC Ex. A. 20:00.  Mathews, who was sitting in his car, which was perpendicular to where Yousif and Hailey were standing, heard Yousif say that he had been stopped in Maryland a few days earlier and asked, "What happened in Maryland after the police stopped you?"  Id. at 23:34.  Yousif loudly sighed and said, "C'mon" and "this is confidential information."  Id.

　　Hailey asked Yousif if he had any other identification, and Yousif responded that he did but that he would need to be uncuffed to get it from his pocket.  Id. 27:16.  Hailey offered to retrieve it but Yousif refused, saying that he was "concerned because of the Fourth Amendment" and that he was not obligated to provide any identification.  Id.

　　When Yousif continued to be uncooperative, refusing requests to provide defendants with his phone or a phone number to verify his identity, Mathews, clearly flustered, exclaimed,

"You're going to leave me no choice but to take you to jail and I am trying not to take you to jail." Id. at 32:30.

At 11:41 p.m., Mathews got out of his car and walked back to where Yousif was standing, while Hailey, sounding exasperated, offered to get Yousif's phone for him, but Yousif ignored Hailey. Id. at 33:11. Instead, he looked away from Hailey and again asked for the handcuffs to be removed so that he could grab his phone. Mathews, who now stood next to Yousif, told him that he would not remove the handcuffs because Yousif was "sitting in a car passed out," had been "uncooperative, [] [] argumentative, [] talk[ed] over top of [defendants]," and had "bloodshot eyes," which led defendants to believe that Yousif was drunk. Id. Mathews reiterated, "I do not want to take you to jail so I am trying to work with you." Id. As Mathews explained this, Yousif repeatedly interrupted Mathews, shouting, "I wasn't passed out," "I'm so tired," and "I'm not drunk!" Id.

At 11:42 p.m., Yousif requested a breathalyzer test. Id. at 34:10. While they waited for the breathalyzer test to arrive, Yousif continued repeating that "this was coincidental" and he had had a long day, to which Mathews responded that "what is coincidental is how you are acting like you are under the influence." Id. at 35:10. This prompted Yousif to again volunteer, "If you guys know what I've been through," "I wasn't passed out," "I'm very tired," and "I have nothing against you guys I'm just like super super super tired." Id. Mathews calmly responded that "we have nothing against you, I just think you're a threat to public safety" because "I'm afraid you're going to go out and wreck into somebody." Id. at 38:30. Defendants also expressed their surprise that an employee from the Department of Defense with Yousif's position would be so "evasive" and "argumentative," and Yousif admitted that "you'd understand if you knew like the

full full story." Id. at 41:00.  Mathews asked Yousif what he meant by that, but Yousif instead said "I have Fourth Amendment rights." Id.

At 11:51 p.m., a third officer arrived with a breathalyzer test.  While Mathews walked away to get the test, Yousif continued being argumentative with Hailey, who again tried to explain why Yousif was being detained, emphasizing that Yousif had been passed out in his car while the car was running and had dilated pupils. Id. at 42:15.

At 11:52 p.m., approximately 40 minutes into the interaction, Mathews tried to administer the breathalyzer test, telling defendant to put his lips on the test's tube and blow, but Yousif refused to take the test because it was not contactless, noting COVID-19 concerns despite having been told that the tube had just come out of a bag. Id. at 43:30.  Yousif tried blowing into the test without making contact, but the test could not successfully be completed in that manner.[6] Id.

Moments later, Mathews asked Yousif for his friend's address, which was nearby, and the third officer drove her car to his friend's apartment complex, while Mathews returned to his own car to continue trying to reach the correct division at the Department of Defense to verify Yousif's identity.  BWC Ex. B. 44:10, 46:05.  After being placed on hold for six minutes, Mathews was transferred to a Department of Defense representative and provided the representative with Yousif's name and CAC number, but because at that point the third officer had returned with Yousif's friend, Mathews told the representative that he would call back. Id. at 55:00.

---

[6] The Amended Complaint incorrectly alleges that the breathalyzer test proved that plaintiff was not intoxicated.  See [Dkt. No. 24] ¶ 54

While Mathews and the third officer spoke with Yousif's friend, Hailey stayed with Yousif. As they waited, Yousif admitted that he was being "evasive" and not being "forthcoming" because he "was NSA." BWC Ex. A. 48:00. Yousif spent time repeating that he only parked in the area "because my head hurt," that he was "super tired," and that he wanted defendants' badge numbers. Id. During a pause, Hailey asked Yousif why he had been stopped in Maryland, and Yousif finally admitted that he was stopped by the "FBI" because they "suspected terrorism" but that it was because people at a hotel were "racially profiling" him, he had a California license plate, and they were "also uptight about the inauguration." Id. at 1:06:00. Hailey told Yousif that he could have disclosed this when he was initially asked, and Yousif responded that he did not want to tell defendants "all these details." Id. at 1:08:00.

At 12:04 a.m., Mathews introduced himself to Yousif's friend and asked whether and how he knew Yousif. BWC Ex. B. 55:45. The friend confirmed that he knew Yousif but asked Mathews to "first" tell him why Yousif had been stopped. Mathews explained that Yousif had been "passed out . . . with the car running" and defendants believed that he was "under the influence" and that Yousif was "not cooperative." Id. Mathews emphasized that all he wanted to do was "to get [Yousif] home safely" but that he could not do that until he could "verify who [Yousif] is." Id. at 56:00. The friend disclosed that Yousif worked for the Department of Defense, that he was spending the night at the friend's house, and that he had "a rough day a few days ago." Mathews asked if the friend was referring to when Yousif "got stopped by the police up in" Maryland, and the friend confirmed, adding that he thought Yousif was "still upset about that." Because Yousif had refused to explain why he had been stopped in Maryland to Mathews, he pressed, "What happened that day?" But the friend refused to explain, instead stating that it was Yousif's business and not his. Id. at 57:20. Mathews replied that he was "concerned" and

that "it's hard to get information from" both Yousif and the friend.  Appearing offended, the friend raised his hand, took a step back, and said, "That is ridiculous that you're saying that," to which Mathews responded, "Alright. Thank you for your time."  Mathews turned around and walked back to his car.  Id. at 58:10.

At 12:07 a.m., Mathews called the representative at the Department of Defense with whom he was speaking earlier, and after nearly 16 minutes, the representative was able to provide Yousif's personal information and confirm that he worked within their division at the Department of Defense.  Id. at 59:00.  At 12:23 a.m., as Mathews hung up the phone, he stepped out of his car and waved the third officer and Yousif's friend over to where Yousif and defendants were standing.  Id. at 1:15:05.  Mathews asked Yousif's friend whether he recognized Yousif and the friend stated that he did.  Mathews then turned to Yousif and told him that "regardless of what you put us through" defendants were going to release him to stay with his friend, despite still believing that Yousif was under the influence.  Id.

Also at 12:23 a.m., Mathews removed plaintiff's handcuffs.  Id. at 1:17:00.  As the handcuffs were removed there was no struggle and Yousif did not appear to be in any pain. Mathews told plaintiff that because they were still suspicious that he was under the influence, he could not drive his car to his friend's apartment; rather, they told Yousif that his friend could drive Yousif's car for him.  Id.  Yousif nevertheless continued questioning defendants, repeating that he was not under the influence.  Seemingly exasperated by Yousif's continued argumentative manner, Mathews told Yousif "I am done talking to you" and "it's time for you to leave."  Id. at 1:19:00.  Defendants then returned to their respective patrol cars.  Id.

According to the Amended Complaint, nearly three weeks after the parties' interaction, Yousif saw his medical provider to discuss "his nerve and wrist pain" and was diagnosed with

13

neuralgia and neuritis that Yousif alleges resulted from being handcuffed.  [Dkt. No. 24] ¶ 41.

Because Yousif "continued to experience excruciating pain in his wrists," he saw his primary

care physician on August 3, 2021.  Id. at ¶ 44.  A nerve conduction revealed that Yousif had

"abnormalities" and "carpal tunnel syndrome," and an MRI revealed a "partial thickness tear of

his dorsal scapholunate ligament."  Id. at ¶ 45.

### C. Procedural History

On January 17, 2023, plaintiff, although proceeding pro se, filed a five-count Complaint

in which he indicated that he had received the assistance of counsel in drafting his pleading.[7] The

Complaint alleges that defendants' unreasonably seized Yousif when they stopped and detained

him for one hour and twenty minutes to investigate his suspicious conduct; used excessive force

against him when they handcuffed him "while he was cooperating with the officers" that resulted

in "physical injuries"; falsely arrested plaintiff after he "submitted to the breathalyzer" because

defendants "could no longer reasonably harbor any suspicion that [plaintiff] was committing a

crime"; and committed assault and battery "in effectuation of an unlawful arrest."  [Dkt. No. 24]

at 7-10.  As a result, plaintiff requests compensatory and punitive damages as well as attorney's

fees and costs.  Id. at 11.

On May 4, 2023, defendants filed the instant Motion to Dismiss, or in the Alternative,

Motion for Summary Judgment with an appropriate Roseboro notice.  [Dkt. No. 15].  On May

25, 2023, plaintiff filed a Motion to Amend and Amended Complaint [Dkt. No. 24], requesting

that the Court "retroactively amend the pleading and summons, as well as to update the docket"

---

[7] In response to that representation, the Court issued an order deeming that attorney to be counsel of record.  On February 25, 2023, plaintiff's counsel withdrew representation, citing "irreconcilable differences," and plaintiff has since acted pro se.  [Dkt. No. 7].

solely to include defendant Lieutenant Dean Edward Mathews' middle name and correct a spelling error in Mathews' last name. [Dkt. No. 23]. The Court granted the Motion "to the extent it request[ed] that the Clerk update the docket sheet to reflect Mathews' correct name."[8] [Dkt. No. 29].

## II. DISCUSSION

### A. Standard of Review

In considering a Rule 12 (b)(6) motion, a court must construe the complaint in the light most favorable to the plaintiff, and take the facts asserted in a complaint as true. Mylan Lab., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). A court may also examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). Rule 12(b)(6) requires that a complaint be dismissed when it does not "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, a complaint must allege enough facts "to raise a right to relief above the speculative level." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Twombly, 550 U.S. at 555). "Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." Id. (quoting Iqbal, 556 U.S. at 679). Even though a pro se complaint is to be construed liberally, it must still state a claim for relief that is plausible. Thomas v. The Salvation Army S. Territory, 841 F.3d 632, 637 (4th Cir. 2016).

---

[8] Defendants advised the Court that they would proceed with their pending motion rather than file a new motion to address plaintiff's Amended Complaint. See [Dkt. No. 32].

### B. § 1983 Claims

#### 1. Qualified Immunity

As an initial matter, defendants argue that they are entitled to qualified immunity as to Yousif's § 1983 claims because they did not violate any of his constitutional rights.  [Dkt. No. 16] at 15.  Yousif opposes this argument, claiming that defendants' actions, which allegedly caused significant injury, are "sufficiently particular to overcome the clearly established prong of the qualified immunity test."  [Dkt. No. 33] at 24.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Supreme Court has emphasized the importance of resolving immunity questions at the earliest possible stage in litigation, and it has mandated a two-step inquiry for resolving a government official's qualified immunity claim.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).  First, a court must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right.  Second, a court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct."  Id.  Courts have discretion to determine which prong to address first, but simply put, "qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  Id.; Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Because, as defendants correctly argue, plaintiff has failed to allege facts supporting a violation of any constitutional right, defendants are entitled to qualified immunity as to the § 1983 claims.[9]

---

[9] Even if defendants had violated plaintiff's constitutional rights, as defendants correctly argue, plaintiff cites to no support, nor can he, to claim that defendants violated any "clearly

i. Unreasonable Search and Seizure (Count I)

The Amended Complaint alleges that defendants unreasonably seized Yousif in violation of the Fourth Amendment because they (1) "did not witness" Yousif "engage in any illegal behavior, and thus "had no probable cause" to seize him, [Dkt. No. 24] ¶ 52; (2) "had no reasonable basis for placing [] Yousif in handcuffs," id. at ¶ 53; and (3) "continu[ed] to detain [] Yousif after he voluntarily took the breathalyzer test" because at that point "officers could no longer reasonably harbor any suspicion that [he] was committing a crime," id. at ¶ 54. Defendants argue that they did not violate plaintiff's Fourth Amendment right because they continued reasonable suspicion to detain plaintiff, and neither the length of the detention nor the fact that plaintiff was handcuffed ripened the detention into an arrest. [Dkt. No. 16] at 11.

If there are "articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." Alston v. Commonwealth, 40 Va. App. 728, 581 S.E. 2d 245, 250 (2003). In determining whether an officer had reasonable suspicion, the Supreme Court has instructed courts "that reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Ryburn v. Huff, 565 U.S. 469, 477 (2012). Indeed, officers can "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person,"

---

established" constitutional right because at the time of the incident, "it was not clearly established that an officer in either [] Hailey's or [] Mathews' position would violate the Fourth Amendment by handcuffing an individual in conducting an investigatory detention" for an hour and twenty minutes "to determine whether that individual was under the influence or whether that individual posed a national security risk." [Dkt. No. 16] at 15.

United States v. Arvizu, 534 U.S. 266, 273 (2002), and they must "simply point to 'specific and articulable facts which, taken together with rational inferences from those facts,' evince 'more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008) (citation omitted).

In reviewing the "cumulative information available" in this action, there is no question that defendants had reasonable suspicion to detain plaintiff and continue the detention to verify his identity, determine whether he was intoxicated and whether he posed any threat to the impending presidential inauguration, and obtain additional information. See Alston, 581 S.E. 2d at 250. Defendants initially saw plaintiff at 11:00 p.m. on January 17, 2021, which was only 11 days after the attack on the United States Capitol and 3 days before the inauguration of President Biden, seemingly "passed out" in the driver's seat of a car with California license plates. The car's engine was running and taking up two spots in a private parking lot. See Sarafin v. Commonwealth, 288 Va. 320, 764 S.E. 2d 71 (2014) (holding that a person behind the wheel of a vehicle with the key in the ignition can be guilty of DUI); United States v. Broadie, 452 F.3d 875, 879 (D.C. Cir. 2006) (finding that "officers could reasonably have detained [the defendant] based upon the reasonable suspicion that he had been or soon would be driving while intoxicated" after the defendant "was found slumped over his steering wheel"). When defendants spoke with plaintiff, he immediately volunteered that he was "not drunk." Where, as here, officers observe a person apparently asleep or unconscious in a running car, coupled with other factors, including "glossy eyes" and disoriented behavior, those "officers [have] reasonable suspicion, at the very least, to investigate further to determine whether [the plaintiff]" is committing an offense. Allen v. Commonwealth, 2023 WL 5207297, at *5 (Va. Ct. App. Aug. 15, 2023).

As the detention continued, the video footage which included sound, showed plaintiff become combative with defendants, refusing to provide information to verify his identity, arguing that defendants' conduct was illegal, speaking over defendants, and ignoring simple commands to ensure officer safety.  See United States v. Avagyan, 164 F. Supp. 3d 864, 881-82 (E.D. Va. 2016), aff'd sub. nom. United States v. Gharzayan, 685 F. App'x 222 (4th Cir. 2017) (finding that canvassing behavior, nervousness, and refusal to cooperate also all contribute to reasonable suspicion when combined with other factors).  Moreover, as Hailey explained and as Yousif even acknowledged, Yousif's suspicious behavior, including his refusal to identify himself, making contradictory statements about his reason for being in Arlington at 11:00 p.m. just days before the presidential inauguration, and out-of-state license plate only added to defendants' reasonable suspicion to continue investigating plaintiff's identity and obtain additional information.  See, e.g., BWC Ex. A. 6:25 (plaintiff acknowledging his suspicious conduct).

Although plaintiff eventually concedes in his Opposition that the Amended Complaint's allegation is premised on a misunderstanding of the appropriate standard required for detention,[10] see [Dkt. No. 33] at 14, the Amended Complaint also alleges that defendants unreasonably seized plaintiff when they "plac[ed] [him] in handcuffs." [Dkt. No. 24] ¶ 53.  But handcuffing a

---

[10] Even under plaintiff's mistaken belief that defendants were required to have probable cause to act, the footage, even when viewed most favorably for plaintiff, plainly shows that defendants had probable cause to believe that plaintiff was committing an offense, especially given that plaintiff appeared "passed out" in a running car, had bloodshot eyes and dilated pupils, refused both field sobriety tests and a breathalyzer test, and acted in a combative manner.  See Cooper v. City of Virginia Beach, Va., 817 F. Supp. 1310, 1318 (E.D. Va. 1993), aff'd sub nom. Cooper v. City of Virginia Beach, 21 F.3d 421 (4th Cir. 1994) (explaining that "the existence of probable cause depends on whether a reasonable person could believe that the person to be arrested was committing a crime").

suspect "do[es] not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances," United States v. Crittendon, 883 F.2d 326, 329 (4th Cir. 1989); rather, "the Fourth Amendment requires the court to assess the reasonableness of using handcuffs based on the circumstances," including an "articula[ble] safety concern." E.W. by & through T.W. v. Doglos, 884 F.3d 172, 179 (4th Cir. 2018); Avagyan, 164 F.Supp. at 895.

Here, Yousif repeatedly ignored defendants' commands to keep his hands on the steering wheel, and later, multiple separate commands to keep his hands on the car. Before handcuffing plaintiff, Hailey "clear[ly]" warned him that if he removed his hands from the car again, he would be handcuffed. BWC Ex. A. 11:05. Mere seconds after Hailey's warning, plaintiff lifted his hands off the car. Id. at 11:45. Under these circumstances, Hailey acted reasonably, and in the interest of minimizing any risk of harm given plaintiff's behavior, in handcuffing him. See Halter v. Hanlon, 2022 WL 459565, at *5 (W.D. Va. Sept. 30, 2022) ("[D]espite the intrusive nature of a detention accompanied or effectuated by handcuffing, the use of handcuffs serves to minimize the risk of harm to officers, the arrestee, and bystanders.").

Finally, the Amended Complaint's allegation that defendants acted unreasonably in continuing to detain Yousif after he had voluntarily taken a breathalyzer test is equally unavailing because Yousif refused to put his mouth on the breathalyzer, instead blowing into the breathalyzer from a distance, so the test was not successfully completed. See BWC Ex. A. 43:30. Even looking beyond the breathalyzer test, "there is no hard and fast rule for how long a stop may last," and in assessing whether a detention is "too long" in duration, courts examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly" while also "attend[ing] to related safety concerns." Avagyan, 164 F. Supp. at 888 (citing United States v. Sharpe, 470 U.S. at 686 (1985)); Rodriguez v. United

States, 575 U.S. 348, 354 (2015) (explaining the importance of weighing the seizure's "mission—to address the [] violation that warranted the stop . . . and attend to related safety concerns").

The detention in this action lasted only for as long as it took defendants to confirm plaintiff's identity and investigate plaintiff's suspicious behavior, and much of the length of the detention resulted from plaintiff's refusal to cooperate with defendants. Avagyan, 164 F. Supp. at 881. Throughout the detention, defendants repeatedly asked Yousif for information to corroborate his identity, including where and for whom he worked and for any identification to verify his CAC. Because plaintiff either ignored or evaded defendants' questions, Mathews was forced to spend time trying to contact the Department of Defense to verify plaintiff's identity and trying to locate plaintiff's friend so that he did not have to "take [plaintiff] to jail." BWC Ex. A. 32:30. Coupled with plaintiff's refusal to undergo any field sobriety tests or properly take the breathalyzer test, his continuous refusal to follow defendants' safety commands and combative manner further prolonged his detention. Despite still having suspicion that plaintiff was intoxicated, defendants nevertheless immediately released Yousif once they found his friend who confirmed that Yousif was spending the night at his house and once Mathews confirmed that Yousif's CAC was valid.

Accordingly, the Amended Complaint does not plausibly allege that defendants violated plaintiff's Fourth Amendment right to be free from unreasonable seizures because defendants had reasonable suspicion to detain plaintiff and immediately released plaintiff once they confirmed his identity and that he posed no public safety risk. On this record, defendants are entitled to qualified immunity.

ii. Excessive Force (Count II)

The Amended Complaint next alleges that defendants used excessive force in violation of the Fourth Amendment by handcuffing him and handcuffing him too tightly. [Dkt. No. 24] at 8. As defendants correctly argue and as discussed above, Hailey's decision to handcuff plaintiff was reasonable considering plaintiff's repeated refusal to follow defendants' commands. [Dkt. No. 16] at 12. Although the Amended Complaint also alleges that the handcuffs were too tight, the body cameras do not show plaintiff ever indicating that he was experiencing any pain or discomfort from being handcuffed.

A district court assessing a claim of excessive force must inquire whether "the [defendant] officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them." Lombardo v. City of St. Louis, 141 S. Ct. 2239, 2241 (2021) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)) (internal quotations omitted). "[A] standard procedure such as handcuffing [will] rarely constitute excessive force where the officers [are] justified . . . in effecting the underlying arrest," E.W. by & through T.W., 884 F.3d at 179, and this principle applies equally to detainees. Halter, 2022 WL 4594565, at *5. Still, "[a] court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Kingsley v. Hendrickson, 576 U.S. 389, 397 (2015). Factors relevant to the inquiry include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id.

22

In analyzing the use of force employed when defendants detained Yousif, the factors discussed in Kingsley tilt overwhelmingly in favor of defendants.  As already explained, Hailey had a reasonable basis for handcuffing plaintiff to protect defendants' safety because Yousif had been combative with defendants, refused simple commands, and in defendants' own words, they were "concerned about the way things [were] going" and their safety.  See BWC Ex. B. 8:20; BWC Ex. A. 22:30.  Defendants were also reasonably suspicious of plaintiff's behavior because he was driving a "suspicious vehicle," that had California license plate, just days before the presidential election.  Moreover, Hailey only handcuffed Yousif after he "clear[ly]" told Yousif to keep his hands on the trunk of his car and only after Yousif again refused to follow Hailey's orders.  See Mensh v. Dyer, 956 F.2d 36, 40 (finding that handcuffing the plaintiff whose behavior, included shouting, refusing to raise his hands, and failing generally to comply with police orders, which made him "appear uncooperative," was not excessive).  Plaintiff's repeated refusal to follow Hailey's reasonable commands under the circumstances provided sufficient justification to handcuff him for the remainder of the investigatory detention.  Id. (explaining that where "the use of force [is] not objectively unreasonable" it is "therefore not constitutionally excessive").

Yousif nevertheless argues that his wrist injuries prove that defendants used excessive force in handcuffing him, [Dkt. No. 33]; however, the body worn camera footage does not support plaintiff's argument.  Despite alleging in the Amended Complaint that he repeatedly pleaded for the officers to remove his handcuffs, the body worn camera footage shows that Yousif never asked for the handcuffs to be removed or loosened due to any pain or discomfort.  The footage also does not show plaintiff moving his hands as if to relieve any discomfort.  When Mathews' removed Yousif's handcuffs, the footage does not show any redness or injury to

plaintiff's wrists.  Moreover, the Amended Complaint claims that plaintiff did not complain about wrist pain until nearly three weeks after the detention.  [Dkt. No. 24] ¶ 41.  Because defendants were not "on notice that the manner in which [Hailey] handcuffed [plaintiff] was excessively forceful," qualified immunity shields defendants from liability for the excessive force claim under § 1983.  See Deavers v. Vasquez, 57 F. Supp. 3d, 599, 609 (E.D. Va. 2014) (granting an officer qualified immunity because the deputy could not "be charged with notice that the quantum of force used . . . crossed the constitutional line").

### C. Common Law Claims

#### 1. False Arrest (Count III)

The Amended Complaint also alleges that defendants falsely arrested plaintiff because he was "engaging in entirely legal conduct" but nevertheless "suffered an intentional restriction on his freedom of movement."  [Dkt. No. 24] at 9.  Defendants argue that they could not have falsely arrested plaintiff because plaintiff has not "allege[d] that he was arrested."  [Dkt. No. 16] at 15.

Under Virginia law, "where a law enforcement officer acts in good faith and with probable cause, he cannot be held liable for false arrest."  Savage v. Cnty. of Stafford, Va., 754 F. Supp. 2d 809, 816-17 (E.D. Va. 2010), aff'd sub nom. Savage v. Sturdivant, 488 F. App'x 766 (4th Cir. 2012) (citing Veney v. Ojeda, 321 F. Supp. 2d 733, 747 (E.D. Va. 2004)).  At the core of any false arrest claim is the requirement that an individual must have been arrested.  See id. Because defendants merely conducted a prolonged detention, as opposed to an arrest, as explained supra II(B)(1)(i), plaintiff's claim for false arrest fails at the start and as such, plaintiff has not pleaded sufficient facts to state a claim for relief that is plausible on its face.

24

2. Battery (Count IV)[11] and Assault (Count V)

In its final two claims, the Amended Complaint alleges that defendants engaged in common law battery and assault because they "made harmful and offensive physical contact with [plaintiff] without [plaintiff's] privilege or consent" and "acted with the intent to place [plaintiff] in apprehension of imminent harmful and offensive bodily contact without legal justification to do so." [Dkt. No. 24] at 9-11.  Defendants argue that they cannot be held liable for assault or battery because their use of force was justified, and "good faith" immunity protects defendants from suit for their reasonable conduct.  [Dkt. No. 16] at 17.

Assault is defined as "an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery."  Koffman v. Garnett, 265 Va. 12, 574 S.E.2d 258, 261 (2003).  A battery is defined "as an unwanted touching which is neither consented to, excused, or justified."  Id.  Both claims require proof of a "wrongful act" and resultant physical injury.  See Pike v. Eubank, 197 Va. 692, 90 S.E. 2d 821, 827 (1956).  As Virginia courts have emphasized, a law enforcement officer's use of force in circumstances that are justified is not a wrongful act and therefore, cannot support state claims for assault and battery.  See McLenagan v. Karnes, 27 F.3d 1002, 1009 (4th Cir. 1994).

Here, as defendants correctly argue, defendants' physical contact with plaintiff, specifically, when applying and removing the handcuffs, was justified because they did so to protect themselves after plaintiff refused to follow instructions and refused to keep his hands in

---

[11] The Amended Complaint mistakenly lists two Count III's—Common Law False Arrest and Common Law Battery.  Because each of these claims is different, Common Law Battery has been labeled as "Count IV" in this Memorandum Opinion.

25

place to ensure officer safety during the investigatory detention. Even if defendants had acted in an unjustified manner, they are nevertheless entitled to qualified immunity against plaintiff's common law assault and battery claims. Virginia law provides a defense to officers who subjectively "believed[] in good faith, that [their] conduct was lawful" and whose subjective beliefs were objectively reasonable. Lewis v. Kei, 281 Va. 715, 708 S.E. 2d 884, 890 (1984). "When acting in good faith, the courts will afford [police officers] the utmost protection, and they will recognize the fact that emergencies arise when they are not expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigations in court." Davidson v. Allam, 143 Va. 367, 130 S.E. 245, 246 (1925). Virginia's good faith immunity defense is "congruent with the federal qualified immunity defense," Wingate v. Fulford, 987 F.3d 299, 312 (4th Cir. 2021), and because defendants are entitled to qualified immunity against plaintiff's Fourth Amendment claims under federal law, "they are also entitled to the good faith defense to" plaintiff's assault and battery claims under Virginia law. See id.

### III. CONCLUSION

For the reasons stated above, the Court finds that defendants are entitled to judgment in their favor with respect to plaintiff's § 1983 and common law claims. Accordingly, defendants' Motion to Dismiss [Dkt. No. 15] will be granted by an Order to be issued with this Memorandum Opinion.

Entered this 9th day of November, 2023.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge